1
2
3
4
5
6
7
8           **UNITED STATES DISTRICT COURT**
9           **CENTRAL DISTRICT OF CALIFORNIA**
10

11 **RESONANCE TECHNOLOGY, INC.,**        Case No. 2:09-CV-09538-MRP (PLAx)

12                    Plaintiff,           **CLAIM CONSTRUCTION ORDER**
             v.
13
   **SCHILLER AG ET AL,**
14
                     Defendants.
15

16                    **I.      BACKGROUND**

17       Plaintiff Resonance Technology, Inc. ("Plaintiff") asserts U.S. Patent Nos.

18 5,412,419 ("the '419 patent") and 5,432,544 ("the '544 patent") against defendants

19 Schiller AG and Schiller America, Inc. ("Defendants").  The patents relate to magnetic

20 resonance imaging ("MRI") compatible audio and video systems.  The '544 patent is a

21 continuation-in-part ("CIP") of the '419 patent that includes matter different than the

22 '419 patent.[1]  The parties have asked the Court to construe four terms in the asserted

23 claim 34 of the '419 patent and two terms in the asserted claim 7 of the '544 patent as

24

25 ────────────

26 [1] "A continuation-in-part is an application filed during the lifetime of an earlier nonprovisional application, repeating some substantial portion or all of the earlier nonprovisional application and *adding matter not disclosed* in the said earlier nonprovisional application." U.S. Patent and Trademark Office, Manual of Patent Examining

27 Procedure § 201.08 (8th rev. ed. 2010).  "A CIP application can be entitled to different priority dates for different claims.  Claims containing any matter introduced in the CIP are accorded the filing date of the CIP application.

28 However, matter disclosed in the parent application is entitled to the benefit of the filing date of the patent application."  *Waldemar Link, GmbH & Co. v. Osteonics Corp.*, 32 F.3d 556, 559 (Fed. Cir. 1994).

follows: (1) "video signal," (2) "positioned within the magnetic field of said magnetic resonance imaging device," (3) "shielded cable," (4) "supplied," (5) "MRI image video signals," and (6) "means for selecting whether the display means is displaying said MRI images or said alternate image."

Plaintiff originally brought this patent infringement action alleging that Defendants infringed the '419 patent, the '544 patent, and U.S. Patent No. 5,877,732 ("the '732 patent"). *See* Complaint (Docket No. 1). In response to Defendants' first set of interrogatories, Plaintiff alleged that Defendants infringe fifty-one claims of the '419, '544, and '732 patents. Defendants' Request for a Status Conference, Ex. E at 2-3 (Docket No. 31). The Court set the claim construction schedule, ordering Defendants to identify the terms to be construed on or before July 26, 2010 and both parties to exchange preliminary claim constructions on or before August 23, 2010. Order 5/24/2010 (Docket No. 29). According to the Court's order, Defendants identified thirty-three claim terms and phrases from all three patents that they believed may require construction. *See* Defendants' Request for a Status Conference, Ex. B. However, Plaintiff failed to submit to Defendants substantive preliminary claim constructions on or before August 23, 2010. *See* Defendants' Request for a Status Conference, Ex. D. After a status conference, the Court ordered Plaintiff to "comply with the spirit and the letter of the law" by providing substantive preliminary claim constructions to Defendants. Civil Minutes 9/8/2010 (Docket No. 34). Plaintiff later withdrew forty-nine of the asserted claims, including all twenty-seven asserted claims of the '732 patent. Defendants' Response to Plaintiff's Amended Preliminary Exchange of Claim Construction and Supplemental Responses to Interrogatories, Ex. A (Docket No. 35). Plaintiff also provided amended preliminary claim constructions for only three terms that Plaintiff believed should be construed by the Court. *Id.* Plaintiff's amended claim constructions remained deficient because (1) Plaintiff did not identify both structure and function for a means-plus-function claim term in the '544 patent and (2) Plaintiff failed to provide any construction for three claim terms that Defendants suggested may be in dispute. *See id.*

## II.    LEGAL STANDARD

Patent claims are generally given their "ordinary and customary meaning," which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citation omitted).  How a person of ordinary skill in the art would have understood a claim term at the time of the invention (i.e., the effective filing date) serves as the "objective baseline" from which to begin claim construction.  *Id.*  at 1313.

The claim term is read in the context of the claim in which it appears, as well as in the context of the specification.  *Id.* at 1314-15;  *see ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) ("Claims must be read in view of the specification, of which they are a part.").  However, "[a]bsent contravening evidence from the specification or prosecution history, plain and unambiguous patent claim language controls the construction analysis." *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008).  In some cases, claim interpretation may "involve[] little more than the application of the widely accepted meaning of commonly understood words."  *Phillips*, 415 F.3d at 1314.

*Phillips* outlines a general hierarchy of sources to consult during claim construction: (1) intrinsic evidence such as the context in which the term is used in the claim, the other claims (both asserted and unasserted), the specification, and the prosecution history, and (2) extrinsic evidence such as dictionaries, treatises, and expert testimony.  *Id*. at 1314-18.  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Id*. at 1316 (quoting *Renishaw PLC v. Marposs Societá  per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

### III.   CLAIM CONSTRUCTION

The six claims originally in dispute were (1) "video signal," (2) "positioned within the magnetic field of said magnetic resonance imaging device," (3) "shielded cable," (4) "supplied," (5) "MRI image video signals," and (6) "means for selecting whether the display means is displaying said MRI images or said alternate image."  Through the briefing, the parties came to agree that terms "shielded cable" and "supplied" should be understood to have their ordinary meaning.  *See* Resonance Technology Responsive Claim Construction Brief ("Resonance Technology Responsive Brief") at 12.  The Court agrees that the ordinary meaning of the terms is clear and declines to construe "shielded cable" and "supplied."  The Court addresses each of the remaining four disputed claims below.

The remaining asserted claims are claim 34 of the '419 patent and claim 7 of the '544 patent.  Claim 34 depends on claim 31, 32, or 33.  Claims 31, 32, 33 and 34 are recited below with the disputed claim terms underlined:

31. A video display system for a patient disposed within a magnetic resonance imaging device having a magnetic field, said magnetic resonance imaging device comprising a control room and a magnet room separated by a penetration panel, said magnet room comprising a main magnet having a bore, said video display system comprising:
   a <u>video signal</u>;
   a magnetically inert display comprising a liquid crystal display (LCD) screen;
   said magnetically inert display <u>positioned within the magnetic field of said magnetic resonance imaging device</u>; and
   means for preventing electrical signals generated by said <u>video signal</u> from interfering with said <u>video signal</u>.
32. The system of claim 31, further comprising means for preventing electrical signals generated by said magnetic resonance imaging device from interfering with said video signal.
33. The system of claim 32, wherein at least one of said means for preventing comprises a low pass filter.
34. The system of claim 31, 32 or 33, wherein said video signal is supplied to said magnetically inert display through a shielded cable.

'419 patent 13:7-33.

-4-

Claim 7 depends on claim 1.  Claims 1 and 7 are recited below with the disputed claim terms underlined:

1. A display system compatible with a magnetic resonance imaging (MRI) apparatus disposed in a magnet room, the system comprising:

means for providing <u>MRI image video signals</u>;

an MRI-compatible display means responsive to said video signals and disposed within said magnet room for providing a display within said magnet room, said display means including RF and electromagnetic interference filtering means to prevent noise from said display means from affecting the quality of the images produced by said MRI apparatus.

7. The display of claim 1 wherein said display is further responsive to an alternate source of video image signals illustrative of an alternate image type, and said display further includes a <u>means for selecting whether the display means is displaying said MRI images or said alternate image</u>.

'544 patent 6:55-66, 7:25-30.

**A.  "video signal"**

The parties propose to construe this term of the '419 patent as follows:

| Term | Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| "video signal" | "the visual component of a RF signal from a television receiver, video cassette recorder (VCR) or digital video disc (DVD) containing a recording of a movie or television program" | ordinary meaning |

Schiller's Opening Claim Construction Brief ("Schiller Opening Brief") at 34; Resonance Technology Responsive Brief at 9.

Defendants argue that the proper construction of this claim term is "the visual component of a RF signal from a television receiver, video cassette recorder (VCR) or digital video disc (DVD) containing a recording of a movie or television program." Plaintiff argues that this claim term should be construed to have its ordinary meaning, which the Court understands to mean any visual input to a LCD screen.  *See* Claim Construction Hearing Transcript at 6:9-25, 45:16-23.

-5-

1    Defendants provide multiple references in the specification that support their

2    proposed construction of the disputed claim term.  Beginning with the abstract of the

3    '419 patent, the signal is described as "an incoming RF signal through a television or

4    video cassette recorder . . . ."  '419 patent.  The problem solved by the patent is explained

5    as entertaining the nervous patient undergoing an MRI.  *See* '419 patent 1:61-2:22.  The

6    summary of the invention further explains that the video section signal comes from an RF

7    signal through a television receiver or video cassette recorder.  *See* '419 patent 2:44-50.

8    The detailed description of the invention, which describes the preferred embodiment, also

9    explains that "a television receiver picks up an incoming RF signal through an antenna or

10   from a video source like a video cassette recorder (VCR) player.  The receiver 3

11   processes the incoming RF signal and separates out the sound or audio section signal 17

12   from the picture or video section signal 4."  '419 patent 4:36-41.  Neither Plaintiff or

13   Defendants point to any statement within the specification that deviates from the

14   description of the video signal as an RF signal from a television or video cassette

15   recorder.

16   Defendants also point to statements in the prosecution history that support their

17   proposed construction of the disputed claim term.  During the reexamination of the

18   patent, the inventor Mokhtar Ziarati explained that "as an alternative to sedation,

19   Resonance developed what came to be known as patient comfort systems, which are

20   described and claimed in the '419 patent."  Decl. of Todd Noah, Ex. J at 2.  This

21   statement is consistent with the specification of the '419 patent which explains that the

22   invention is intended to entertain nervous patients undergoing an MRI.  *See* '419 patent

23   1:61-2:22.  The patentee further distinguished the patented claims from the prior art in a

24   response to an office action during reexamination by stating that "[t]he Blakeley patent is

25   directed to a cardiac monitor, not a patient entertainment display" as is claimed in the

26   '419 patent.  Decl. of Todd Noah, Ex. K at 22.  This statement is also consistent with

27   entertainment content being provided from a television or video cassette recorder.

28

-6-

The visual component of a RF signal appears to be the ordinary meaning of video signal.  The patentee may act as his own lexicographer to give a definition to a term that is different from the ordinary meaning, but the patentee must clearly state that special definition of a term in the patent specification or file history.  *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009).  In this patent, it is clear from the specification and prosecution history that the patentee clearly limited the term video signal to video provided through a television or video cassette recorder.  The patent is for an entertainment system to provide comfort to patients undergoing an MRI and the sources of the entertainment are clearly enumerated.  Although suggested by Defendants, there is no support for the source being a digital video disc system.  The Court therefore construes "video signal" to mean "the visual component of a RF signal from a television receiver or video cassette recorder."

**B. "positioned within the magnetic field of said magnetic resonance device"**

The parties propose to construe this term of the '419 patent as follows:

| Term | Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| "positioned within the magnetic field of said magnetic resonance device" | "inside the bore of the main magnet of the MRI device" | ordinary meaning |

Schiller Opening Brief at 34; Resonance Technology Responsive Brief at 10.

Defendants argue that the proper construction of this claim term is "inside the bore of the main magnet of the MRI device."  Plaintiff argues that the claim term should be given its ordinary meaning, which the Court understands to mean positioned within the magnet room, but not limited to positioned within the bore.  Claim Construction Hearing Transcript at 47:2-7.  The Court looks to the intrinsic evidence of the '419 patent to construe the claim term.  The placement of the LCD screen is discussed at multiple points

within the specification.  The abstract of the '419 patent states that the LCD screen is mounted to the bore with a mushroom shaped hook.  *See* '419 patent.  The detailed description of the invention in the specification, which describes the preferred embodiment, also describes how the LCD screen can be mounted within the bore of the magnet.  *See* '419 patent 5:56-6:34.  By contrast, the summary of the invention in the specification suggests that the LCD screen could be placed outside of the magnet bore such that "a patient lying prone inside the magnet bore can then watch the television pictures on the reflective screen through a pair of prism glasses worn by him."  '419 patent 2:57-65.  The summary of the invention further states that "without the lens system, the patient views the LCD display screen directly" with the LCD screen mounted within the bore.  '419 patent 2:66-3:2.  The specification, therefore, discloses placement of the LCD screen both within the bore and outside of the bore, but still within the magnet room.

Although the claims must be construed in light of the specification, it is important "not to confuse exemplars or preferred embodiments in the specification that serve to teach and enable the invention with limitations that define the outer boundaries of claim scope."  *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010); *see also Philips*, 415 F.3d at 1323.  One of the references to the LCD screen placement is made within the discussion of the preferred embodiment and cannot be used to limit the claim term.  Of the other two references to the LCD screen placement, one suggests the LCD screen must be mounted within the bore and the other does not.  There is no evidence that the patentee intended to act as his own lexicographer to give the disputed term a special definition of inside the bore.  The ordinary meaning of being "positioned within the magnetic field of said magnetic resonance device" means that the LCD screen can be positioned anywhere within the magnet room and not just within the bore.  Since the ordinary meaning of the term is clear, the Court declines to construe "positioned within the magnetic field of said magnetic resonance device."

**C.	"MRI image video signals"**

-8-

The parties propose to construe this term of the '544 patent as follows:

| Term | Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| "MRI image video signals" | "images provided by an MRI image processor" | ordinary meaning |

Schiller Opening Brief at 34; Resonance Technology Responsive Brief at 15.

Defendants argue that the proper construction of "MRI image video signals" is "images provided by an MRI image processor." Plaintiff argues that the claim term should be given its ordinary meaning, and that the source of the "MRI image video signals" must be patient images. Through the briefing, Defendants came to agree that the source of the "MRI image video signals" are patient images.

The source of the dispute between the parties appears to be whether "MRI image video signals" could also include images from alternative sources such as an ultrasonic imaging apparatus or an apparatus providing patient vital sign data. It is clear from the language of the claims that "alternate images" are different from "MRI images." Claim 7 includes a "means for selecting" between "said MRI images or said alternate image." '544 patent 7:28-30. Claim 9 clearly states that one of the sources of an "alternate image" is an apparatus for providing patient vital signs. *See* '544 patent 7:33-35. Claim 12 clearly states that another alternate source is an "MRI compatible ultrasonic imaging apparatus." *See* '544 patent 7:41-44. Furthermore, the summary of the invention in the specification states that alternate image sources include "an MRI compatible ultrasonic imaging apparatus located within the magnet room, apparatus for providing patient vital sign data and the like." '544 patent 2:35-37. Plaintiff does not provide any evidence to suggest that the meaning of "MRI image video signals" would include vital sign data or ultrasonic images. In fact, both the claims and specifications make it clear that the sources of signals are split between "MRI images" and "alternate images," with vital sign data and ultrasonic images being categorized as "alternate images."

Defendants, by contrast, have provided evidence that the meaning of "MRI image video signals" means patient images provided by an MRI image processor. The summary

of the invention in the specification states that "MRI video image signals are provided by
an MRI image processor connected to the MRI apparatus in the magnet room." '544
patent 2:20-22.  This is in contrast to the alternate video image signals provided by
alternate sources.  The Court construes "MRI image video signals" to mean "patient
images provided by an MRI image processor."

D. **"means for selecting whether the display means is displaying said MRI**
   **images or said alternate image"**

The parties propose to construe this term of the '544 patent as follows:

| Term | Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| "means for selecting whether the display means is displaying said MRI images or said alternate image" | Structure: "an electrical switch connected to a projector or screen display"  Function: "to select the input to the display for determining whether the display is displaying MRI images or alternate images" | Structure: "a connection"  Function: "the ability to select between MRI image and an alternate image" |

Schiller Opening Brief at 30; Resonance Technology Opening Claim Construction Brief
at 7.

Claim construction of a means-plus-function limitation requires the court to
determine the claimed function and identify the corresponding structure that performs the
function in the written description.  *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448
F.3d 1324, 1332 (Fed. Cir. 2006).  The Court begins with its construction of the claimed
function.  The parties offer similar constructions for the function of the means-plus-
function claim language.  The '544 patent specification is clear that the invention is a
display system capable of displaying MRI images as well as other images.  The abstract
of the '544 patent describes the invention as "[a] display system for display of MRI,
ultrasonic, patient vital sign or other imagery within a magnet room of an MRI system."
'544 patent.  Furthermore, the claim language is clear that the function of the means-plus-
function claim is to select between sources for displaying MRI images or alternate

1    images.  *See* '544 patent 7:28-30.  Therefore, the Court construes the function of the

2    means-plus-function claim to be "to select between displaying MRI images or alternate

3    images."

4            Next, the Court addresses the corresponding structure that performs the function of

5    the means-plus-function claim.  "An element in a claim . . . expressed as a means or step

6    for performing a specified function . . . shall be construed to cover the corresponding

7    structure, material, or acts described in the specification and equivalents thereof."  35

8    U.S.C. § 112, ¶ 6.  Therefore, the Court looks to the specification for the disclosure of the

9    corresponding structure.  Defendants argue that the corresponding structure should be

10   construed as "an electrical switch connected to a projector or screen display."  In the

11   detailed description of the preferred embodiment of the specification, there is "[a] switch

12   76 . . . provided to select the desired video input to be processed and displayed by the

13   projector 40."  '544 patent 4:36-40.  In its brief, Plaintiff argues that the corresponding

14   structure should be construed as "a connection."  Resonance Technology Opening Claim

15   Construction Brief at 7.  At the claim construction hearing, Plaintiff argued that the

16   corresponding structure was "the input into the LCD device."  Claim Construction

17   Hearing Transcript at 51:19-20.  However, Plaintiff does not point to disclosures in the

18   specification of the '544 patent to support either construction, as is required under § 112,

19   ¶ 6.  The Court cannot adopt a construction of a corresponding structure that is not

20   described in the specification.

21           As regards Defendants' proposed construction, there are two issues with finding

22   the corresponding structure to be a "switch."  First, the disclosure of the switch structure

23   is made in the description of the preferred embodiment only.  "When the specification

24   describes a single embodiment to enable the invention, this court will not limit broader

25   claim language to that single application unless the patentee has demonstrated a clear

26   intention to limit the claim scope using words or expressions of manifest exclusion or

27   restriction."  *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) (internal

28   citations omitted).  Defendants have offered no such clear expressions of exclusion or

restriction in the specification or the prosecution history that suggest the selecting means should be limited to switches.  Therefore, there is insufficient support for a construction that limits broader claim language to the preferred embodiment.  Second, under the doctrine of claim differentiation, different words in different claims result in a difference in meaning and scope for each of the claims.  *See Phillips*, 415 F.3d at 1314-15.  Claim 8 depends on claim 7 and is recited as follows:  "The display of claim 7 wherein said selecting means comprises a switch."  '544 patent 7:31-32.  Because claim 8 depends on claim 7, it was intended to have a narrower scope than claim 7.  The narrower scope of claim 8 requires the selecting means to comprise a switch.  It would go against the doctrine of claim differentiation by rendering claim 8 meaningless to find that the selecting means of claim 7 was also limited to comprise a switch.  The selecting means of claim 7 must be something broader than a switch in order to differentiate between claim 7 and 8.  Defendants do not offer any explanation for why the corresponding structure of the means-plus-function claim 7 can be so limited in light of claim differentiation.

Neither party has provided a compelling argument for why its identification of the corresponding structure of the means-plus-function claim is correct.  The Court declines to construe the structure of the means-plus-function term in claim 7 of the '544 patent.  There does not appear to be adequate disclosure in the specification of the '544 patent of a corresponding structure linked to the selecting means described in claim 7.  The switch structure is linked to the preferred embodiment and the selecting means of claim 8, but not to the more general claim 7.  The Court invites summary judgment briefing of the issue of invalidity for indefiniteness.  "If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the patentee will have 'failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112,' which renders the claim invalid for indefiniteness." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009) (quoting *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc)).

1

**IV.   CONCLUSION**

2       The Court adopts the constructions set forth in this opinion for the disputed terms

3 of the '419 and '544 patents.  The constructions shall govern all proceedings in this case.

4 The parties are ORDERED not to refer directly or indirectly to each other's claim

5 construction positions in the presence of the jury in this case.  Likewise, the parties are

6 ORDERED to refrain from mentioning any portion of this opinion, other than the actual

7 definitions adopted by the Court, in the presence of the jury in this case.

8       IT IS SO ORDERED.

9

10 DATED:  November 22, 2010

11                                              Hon. Mariana R. Pfaelzer
                                                 United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-13-